IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**RODERICK D. MARKS, SR.**                                    **PLAINTIFF**

v.                              **No. 5:11-cv-319-DPM**

**UNION PACIFIC RAILROAD COMPANY**              **DEFENDANT**

ORDER

Roderick Marks works as a yard conductor, a job also known as a switchman, at Union Pacific's Pine Bluff yard. Marks alleges that he hurt his shoulder when he uncoupled two railcars while sorting and switching them. The Federal Employers' Liability Act required Union Pacific to provide Marks a reasonably safe place to work and measures whether the railroad did so with a modified negligence standard. 45 U.S.C. § 51. The Safety Appliance Act required UP to have certain kinds of equipment, including couplers, on cars and other vehicles used on its lines.   49 U.S.C. §§ 20301(a) & 20302(a)(1)(A).  If equipment in use is defective under this second statute, then UP's liability is settled, and Marks is relieved of having to show any negligence by the railroad. Whether the Safety Appliance Act applies, and whether the record presents jury questions, are the issues raised by the parties' cross motions for summary judgment.

**1. The Safety Appliance Act.** The applicable statutory words are in the margin, with the key provision about couplers italicized.[1]   UP's main argument for judgment as a matter of law is straightforward: because boxcar No. EEC 5106 was being switched in UP's yard, it was not in use when Marks allegedly hurt his shoulder uncoupling the boxcar from another car.  Use is a question of law depending upon the totality of the circumstances.  *Wright*

---

[1] (a) General. — Except as provided in subsection (c) of this section and section 20303 of this title, *a railroad carrier may use or allow to be used on any of its railroad lines —*

   (1) *a vehicle only if it is equipped with —*

      *(A) couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles;*

      (B) secure sill steps and efficient hand brakes; and

      (C)  secure ladders and running boards when required by the Secretary of Transportation, and, if ladders are required, secure handholds or grab irons on its roof at the top of each ladder;

   (2) except as otherwise ordered by the Secretary, a vehicle only if it is equipped with secure grab irons or handholds on its ends and sides for greater security to individuals in coupling and uncoupling vehicles;

   (3) a vehicle only if it complies with the standard height of drawbars required by regulations prescribed by the Secretary;

   (4) a locomotive only if it is equipped with a power-driving wheel brake and appliances for operating the train-brake system; and

   (5) a train only if —

      (A) enough of the vehicles in the train are equipped with power or train brakes so that the engineer on the locomotive hauling the train can control the train's speed without the necessity of brake operators using the common hand brakes for that purpose; and

      (B) at least 50 percent of the vehicles in the train are equipped with power or train brakes and the engineer is using the power or train brakes on those vehicles and on all other vehicles equipped with them that are associated with those vehicles in the train.

*v. Arkansas & Missouri Railroad Co.*, 574 F.3d 612, 620 (8th Cir. 2009). The *Wright* case dealt with a locomotive and the Locomotive Inspection Act; but the in-use provision of that Act echoes the one in the Safety Appliance Act, so the same totality standard applies. *Steer v. Burlington Northern, Inc.*, 720 F.2d 975, 977 n.3 (8th Cir. 1983); *compare* 49 U.S.C. § 20301 *with* 49 U.S.C. § 20701. Here, albeit with some quibbling at the edges, the facts material on the statutory interpretation question are undisputed. № 24-1, 36 & 41.

Marks allegedly hurt his shoulder during switching operations in the bowl of the Pine Bluff yard. A co-worker was operating a remote-control switch engine. Marks was walking beside cars on the tracks in the bowl. Car no. FTTX 972934 and car no. EEC 5106 were coupled on bowl track 45. To switch the first car to track 44, Marks had to lift the uncoupling lever, or pin lifter, on the second car. This action would release the coupler, allowing car no. FTTX 972934 to be kicked to the other track. The pin lifter wouldn't move the first time Marks tried to lift it because the knuckle made by the joined couplers of the two cars was stretched. These circumstances were routine, not indicative of any equipment problem. The cars were pushed a bit closer together, and Marks lifted again. This time, Marks says and UP disputes, the

pin lifter moved but got stuck on its way up, jerking Marks's arm, releasing car no. FTTX 972934, and also injuring his shoulder.  № 24-5 at 25-28.  Boxcar no. EEC 5106 had been inspected and OK'd when it arrived at UP's yard.  The car was not out of service or being repaired.  It was not on a repair track or at some other place where repairs are done.  It was not blue-flagged.  The car had not yet been assembled into a train or cleared in a pre-departure inspection.  The car's pin lifter allegedly malfunctioned in the middle of routine switching operations in the rail yard.  An inspection after the incident revealed no problem in the pin lifter.

Considering the totality of the circumstances, this boxcar was in use within the meaning of the Safety Appliance Act when the pin lifter allegedly didn't function like it was supposed to.  *Wright*, 574 F.3d at 620.  The Court has studied the statute and the precedent, which is extensive and mixed. There is no definitive word from either the Supreme Court or the United States Court of Appeals for the Eighth Circuit. This Court is persuaded by the analysis in *Ditton v. BNSF Railway Co.*, 2013 WL 2241766, *9-*13 (C.D. Cal. 21 May 2013).  It is a hand brake case.  But hand brakes and couplers are both part of the statute's mandated safety equipment for cars and other vehicles;

-4-

and *Ditton*'s synthesis of the statute, and the main authorities, is careful and, this Court concludes, correct. The Court acknowledges but respectfully disagrees with, contrary decisions on this particular point from the United States Courts of Appeals for the Fourth and Fifth Circuits. *Trinidad v. Southern Pacific Transportation Co.*, 949 F.2d 187, 189 (5th Cir. 1991); *Phillips v. CSX Transportation, Inc.*, 190 F.3d 285, 289 (4th Cir. 1999). These decisions elide the statute's distinction between vehicles and trains. *Compare* 49 U.S.C. § 20302(a)(1)-(3) *with* 49 U.S.C. § 20302(a)(5). And they misapprehend the Supreme Court's scattered *dicta*, which admittedly points in different directions.[2]

---

[2] *Compare United States v. Erie Railroad Co.*, 237 U.S. 402, 408 (1915) (saying, in a train-transfer case, that the coupler and hand brake provisions of the Act sweep more broadly than the air brake provisions) *with United States v. Northern Pacific Railway Co.*, 254 U.S. 251, 254 (1920)(saying, in a case about transfers between yards, that a "moving locomotive with cars attached is without the provision of the [SAA] only when it is not a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains.") *and United States v. Seaboard Air Line Railroad Co.*, 361 U.S. 78, 80 (1959) (noting that switching operations are not "train movements" within the meaning of the SAA).

UP contends that, as long as a car is involved in switching operations in a yard, the railroad is not using the vehicle on its line. No yard-switching exception for switching activities in the yard, however, appears in the Safety Appliance Act. It would be passing strange if the Act's required safety equipment for cars—automatic couplers, efficient hand brakes, secure sill steps, secure ladders and grab irons—was not required, after all, in a place (rail yards) where this equipment was used regularly during a time (switching) when this equipment was needed to accomplish the Act's purpose.

UP argues that switching in the yard merits a different construction of the statute, so vehicles can be inspected and fixed before they're assembled into trains and cleared to run subject to the SAA's liability. *Wright*, 574 F.3d at 620. There are two answers. First, all cars must be inspected on entering the yard, like car no. EEC 5106 was. *№ 24-8 at 7 & 16-17*. This provides an opportunity to take a car with an equipment problem out of service or to make quick repairs. Second, under *Wright*'s required look at all the circumstances, a car out of service, or being repaired, or in limbo at a place of repair, would almost certainly not be in use within the statute's meaning.

-6-

UP's argument thus proves too much.

The Court is fortified in its conclusion by some older cases involving couplers. In each, part of a coupler allegedly malfunctioned in the yard during switching. And the Safety Appliance Act applied. *E.g., Delk v. St. Louis & San Francisco Railroad Co.*, 220 U.S. 580, 582-86 (1911); *O'Donnell v. Elgin, Joliet & Eastern Railway Co.*, 338 U.S. 384, 385 (1949); *Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Linehan*, 66 F.2d 373, 374 (8th Cir. 1933); *Coleman v. Burlington Northern, Inc.*, 681 F.2d 542, 543-45 (8th Cir. 1982). Similar yard/switching cases about defective hand brakes that were covered by the SAA are in the books too. *E.g., Myers v. Reading Co.*, 331 U.S. 477, 478-80 (1947). The SAA's text has evolved over time, but the changes do not seem material on the use point. No one appears to have argued in any of these cases that a car was not in use simply because it was being switched in a rail yard. That the railroad was using the car within the meaning of the SAA was the premise of all these decisions. Issues not argued are not decided. But this page of history shows, if not a settled understanding, two things at least: a long-common assumption about the reach of the Safety Appliance Act, and the novelty of the *Trinidad/Phillips* "switching in the yard" exception.

Marks's request for judgment as a matter of law on his SAA claim is rejected too. A railroad employee with long experience says that a sticky pin lifter is not performing properly. Dragoun Depo. № 28-5 at 14. The *only* evidence that this pin lifter malfunctioned is Marks's testimony. This is not a case where part of a coupler broke and the equipment's failure was patent. *Compare, e.g., O'Donnell, supra.* No problem or defect was found in the device when car no. EEC 5106 came into the yard. None was found after Marks's incident when UP tested the pin lifter. The statements of Marks's coworker are muddy. It is not clear he could see what happened very well. Taking the testimony in the light most favorable to the railroad at this point, Marks struggled with the pin lifter on the first pull when the knuckle between the cars was stretched, but the pin lifter operated successfully on the second pull after the cars were bunched. *Compare* McComb Aff. № 24-7, *with* McComb Stmt. № 28-6 and Marks Depo. № 24-5 at 25.

All this comes down, then, to a question of Marks's credibility. If the jury believes him, that will be enough, notwithstanding the evidence of proper functioning before and after, to sustain a verdict on his SAA claim. If the jury disbelieves Marks in light of the other proof, his claim will fail. The

fact finder must make the call. *Coleman*, 681 F.2d at 544-46. Marks need not prove a defect, but the jury must resolve whether the pin lifter in fact failed to perform as required by the SAA. *Norfolk and Western Railway Co. v. Hiles*, 516 U.S. 400, 409 (1996).

   **2. Federal Employers' Liability Act.** All the issues here, except a causation point discussed below, are for the jury too. An SAA violation would of course establish UP's FELA liability. *Coleman*, 681 F.2d at 544. Putting that possibility aside, any negligence on the railroad's part, no matter how slight, would support a recovery on Marks's stand-alone FELA claim. *CSX Transportation, Inc. v. McBride*, 131 S. Ct. 2630, 2636 (2011). Marks has testified on deposition that, on his second pull, the pin lifter moved about halfway then stuck, jerking and injuring his shoulder, before releasing. № 24-5 at 25-28. While UP argues hard that, given the rest of the proof, either things did not happen as Marks says or no injury resulted, Marks's testimony (if believed) is enough to get to the jury on causation and the other elements of his negligence case. *McBride*, 131 S. Ct. at 2642-43. That a switchman might injure his shoulder using a sticky pin lifter was reasonably foreseeable to UP. *McBride*, 131 S. Ct. at 2643. This is not a case into the frontier of the

unexpected, for example, where a truck driver injured himself trying to move a several hundred pound dumpster alone.   *E.g., Ethyl Corp. v. Johnson*, 345 Ark. 476, 483 49 S.W.3d 644, 649 (2001) (Arkansas law).   The railroad need not have foreseen that Marks would injure his shoulder using this pin lifter for there to be a submissible case — the kind of harm alleged is reasonably foreseeable.   *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 117-21 (1963); *Davis v. Burlington Northern, Inc.*, 541 F.2d 182, 185 (8th Cir. 1976).

**3. Causation and Experts**.   That a switchman might hurt his shoulder using a pin lifter is a matter of common sense, much like "a broken leg from being struck by an automobile."   *Brooks v. Union Pacific Railroad Co.*, 620 F.3d 896, 899 (8th Cir. 2010)(quotation omitted).   Who hasn't strained a muscle pulling a sticky lever or lifting something?   But Marks's alleged damage is a traumatic injury — a torn rotator cuff, requiring surgery and extensive treatment.   The causal connection between that alleged acute injury and the pin lifter incident is not a matter obvious to someone without medical training.   So Marks needs expert testimony to get to the jury on the alleged traumatic injury.   620 F.3d at 899.   Even though Marks's causation burden is minimal under *McBride* — a cause, not the proximate cause — an expert must

-10-

establish the causal connection.

UP offers the thorough and comprehensive opinion of Dr. Peeples that Marks's rotator cuff tear was a degenerative condition. It was, he says, a product of age, weight, ordinary wear and tear, not trauma from a particular event such as tussling with a sticky pin lifter. № 24-14. In response, Marks falls back to a medical record from his first visit to Dr. Bowen, who treated him and eventually operated on him. № 28-3. Marks does not meet UP's proof with a responding affidavit or declaration from Dr. Bowen.

The difficulty here is not a matter of form. Though probably prepared by Dr. Bowen's assistant, and hearsay, the Court has no doubt that the medical record's contents could be offered in admissible form at trial. FED. R. CIV. P. 56(c)(2). Dr. Bowen signed the report, and his treatment of Marks gives him personal knowledge. The difficulty is a matter of substance under Rule of Evidence 702.

Dr. Bowen's opinion was tentative. His "impression" was "1. Left shoulder impingement" and "2. Rotator cuff tear, traumatic." № 28-3 at 2. But the trauma, the critical part of the opinion on the causation issue, seems to be based entirely on Marks's report about his injury's history. Dr. Bowen

-11-

hedged in his "plan" for Marks. "Due to the fact that he never had symptoms before, *I would anticipate this was an acute injury*, though he did have an AC joint at an earlier time for which he does not recall." № *28-3 at 2* (emphasis added). In this early record, Dr. Bowen did not rule out other causes. He did not address the absence of trauma in the first MRI's results. He did not explain what the surgery eventually revealed because it hadn't happened yet. And Dr. Bowen did not state his conclusion about cause with enough certainty.

This is all too thin to create a jury question about the cause of the rotator cuff tear in light of Dr. Peeple's unequivocal opinion: "Marks has an acquired medical condition, rotator cuff, consistent with increased age, increased weight, and the presence of degenerative osteophytes of the AC joint plus impingement from a type II acromion. His shoulder condition is degenerative and was not caused by the June 5, 2010 incident at Union Pacific Railroad." № *24-14 at 2*. Marks has not met expert proof with expert proof sufficient to create an issue of material fact about the cause of his torn rotator cuff. *Brooks*, 620 F.3d at 900; *Bland v. Verizon Wireless, LLC*, 538 F.3d 893, 899 (8th Cir. 2008).

On causation of the rotator cuff tear, UP's motion is granted with a caveat. Marks may move to reconsider before 4 October 2013 with a sworn opinion from Dr. Bowen that satisfies Rule 702. The Court grants this opportunity for several reasons. Dr. Bowen, as a treating physician, is not within Marks's control. Trial is five months away. Marks's primary argument was that no expert testimony was required, an argument now rejected. And Marks made a timely and adequate disclosure[3] that Dr. Bowen would be testifying on the causation issue based on his treatment. *№ 35-1*. Though Marks should have gotten an affidavit or declaration before now, in the circumstances the Court will extend a final opportunity to get the causation issue "two blocked." *Brooks*, 620 F.3d at 898 n.2. If Dr. Bowen does not provide this testimony by the deadline, then Marks's proof of injury must stop at a hurt shoulder; the rotator cuff tear, surgery, and treatment will not come into the case.

---

[3] The Court of Appeals has not yet decided whether *Brooks*'s Rule 26 holding about a treating doctor's causation opinion survived the 2010 changes to the Rule. *Bradshaw v. FFE Transportation Services, Inc.*, 715 F.3d 1104, 1109 and n. 3 (8th Cir. 2013). This Court concludes that the Court of Appeals would hold that it does not and that FED. R. CIV. P. 26(a)(2)(C), which requires no written report, applies. *See* Advisory Committee Notes (2010 Amendments).

\*       \*       \*

UP's motion for summary judgment, № 23, is denied in part and granted in part with a caveat. Marks's motion for summary judgment, № 26, is denied. UP's motion to supplement, № 45, is granted.[4] There is no prejudice to Marks from allowing the railroad to provide the omitted exhibit, which is already part of the summary-judgment record. Joint status report due by 11 October 2013. The report should cover length of proof in hours, whether defense counsel still has a conflict with the February trial date, whether the parties want a settlement conference, and any other matter needing ventilation.

So Ordered.

D.P. Marshall Jr.
United States District Judge

18  September 2013

---

[4]The Court directs the Clerk to correct the name of № 45 in the docket sheet.

-14-